## Case No. 15,275.

UNITED STATES v. HAINES et al.

[5 Mason, 272.] [1]

Circuit Court, D. Massachusetts. May Term, 1829.

SEAMEN—OBEDIENCE—NEW MASTER—REVOLT.

1. The crew of a ship who have signed shipping articles for the voyage under a particular master, without any clause providing for a change of master, are not discharged from the articles by the dismissal of the master by reason of sickness, or any other reasonable cause, and the appointment of a new master; but they are bound to obey the new master.

[Cited in U. S. v. Nye, Case No. 15,906.]

2. If in such case they combine together to refuse all duty on board, and to refuse obedience to the new master, that is an endeavour to make a revolt, within the meaning of the crimes act of 1790, c. 9 (36), § 12 [1 Stat. 115; 1 Story's Laws, 85.]

[Cited in U. S. v. Gardner, Case No. 15,188; U. S. v. Forbes, Id. 15,129; U. S. v. Huff, 13 Fed. 636.]

Indictment against the defendants [Benjamin Haines and others] for an endeavour to make a revolt on board the ship Plato, in Boston harbour, founded on the crimes act of 1790, c. 36 (9), § 12 [1 Story's Laws, 85; 1 Stat. 115]. Plea, not guilty. At the trial it appeared in evidence, that the ship was owned by American citizens, and was bound on a voyage from Boston to Havana, from thence to ports in Europe, from thence to the East Indies, and back to Europe or the United States; and that one Thomas Dimmock was master. The defendants were seamen on board, and had shipped for the voyage under the common shipping articles, in which Thomas Dimmock was described as master, and there was no clause, "or whoever else shall be master for the voyage," in the articles. The ship being ready for the voyage dropped down to the outer harbour of Boston, called "Nantasket Roads," to proceed to sea, about the 10th of June, 1829.

[1] [Reported by William P. Mason, Esq.]

But the master, before actually proceeding to sea, was taken ill with a dangerous disease; and in consequence of his illness it became necessary to substitute another master for the voyage. The new master (who was a competent and suitable master) came on board with some of the owners, while the ship lay in Nantasket Roads, and the necessity of the change of the master was stated to the seamen. They made no particular objection to the new master, whose character did not appear to be known to them; but the defendants and another of the crew (in all seven) contended, that their contract was dissolved by the removal of the master, and they accordingly refused to go on the voyage. Orders were given by the new master to weigh anchor and proceed to sea; which the defendants refused to obey; and those of the crew who were ready to obey, took the starboard side of the ship, and the defendants and those who acted with them took the larboard side. The master and owners then resorted to persuasion, and endeavoured to induce the defendants to return to their duty, and to obey the orders; and each being severally asked, refused, though the legal consequences of their refusal was stated to them. They offered no force to the master or owners, and used no threatening or insulting language. The defendants were then carried on shore, and being apprehended on a warrant, were brought before the district judge, who upon the examination explained the law to them, and urged their return to duty. But they refused, and were committed for trial. The owners, upon the examination, expressed an entire willingness to take them on board again, and to forgive and forget the past, if they would go upon the voyage; but these offers had no effect.

Dist. Atty. Dunlap, for the United States.

S. D. Parker, for defendants.

Two points were made in the defence: (1) That the contract of shipment was dissolved by the appointment of a new master. (2) That the acts of the defendants did not amount to the legal offence charged in the indictment. On the last point, the case of U. S. v. Kelly, 11 Wheat. [24 U. S.] 417, was cited.

Mr. Dunlap, in reply, cited U. S. v. Hamilton [Case No. 15,291], U. S. v. Smith [Id. 16,337], and U. S. v. Hemmer [Id. 15,345], and he contended, that the case U. S. v. Kelly, 11 Wheat. [24 U. S.] 417, was in no respect variant from the doctrine stated in the latter cases.

STORY, Circuit Justice, in summing up to the jury, said: The principal facts in the case are not disputed; and the only question of fact suggested for consideration in the defence is, whether the defendants acted and co-operated together in a common purpose, or separately refused duty without any encouragement or mutual understanding. Upon this the jury will pass their judgment, though as the parties were all present and refused duty at the same time, and separated themselves from the rest of the crew, there would not seem much room to doubt as to their conduct being governed by a common combination and encouragement. A mere refusal to do duty on the part of a single seaman, without any attempt to encourage, or aid, or influence any others of the crew to the same act, would certainly not amount to an endeavour to commit a revolt. There must be some effort or act, to incite or encourage others to disobedience, or some common combination, or understanding, to act together for mutual encouragement or support in such disobedience.

There are two questions of law arising upon the facts. The first is, whether in the case of a dismissal of a master for a reasonable cause without fraud, the contract with the seamen is dissolved, unless the shipping articles contain some clause providing for the substitution of a new master, so that the seamen are not bound to perform the voyage, or to obey the new master. The second is, whether, supposing there was a mutual co-operation and combination of the defendants to refuse duty, and to disobey the new master, that amounts to an endeavour to make a revolt.

We do not think there is any real difficulty in either point.

As to the first, the contract created by the shipping articles is not, by the maritime law, a contract exclusively between the existing master and the seamen for the voyage. It is rather a contract between the seamen and the owner through the instrumentality of the master, as agent of the owner, than on his own account. For the performance of the contract, however, the seamen have the security of the master and the owner, and also of the ship itself, by a lien thereon for their wages. There is an implied right of the owners to substitute any other master during the voyage, and an implied obligation on the part of the seamen to obey the master for the time being. If, indeed, they do not expressly assent to the substitution, as between themselves and the original master, he may not be absolved from his responsibility for the wages antecedently due. But this does not affect the right of the owner to appoint another master. It would be most injurious to the interests of commerce and navigation, if any other rule prevailed. If the shipping contract were dissolved by the mere change of master, in whatever stage of the voyage it might occur, the whole objects of the voyage might be defeated by the delays incident to the shipment of a new crew, and the exposure of the property to extraordinary risks. The master might die, might be disabled, or might misconduct himself in the course of the voyage, so that there

might arise a necessity of appointing a new master. It might occur at sea, or in a foreign port. And if by such an event, the shipping contract was dissolved, there would be an end of all obedience, and of all right to wages, for any subsequent services. The ship might, if the master should die on the sea, be exposed to the most imminent perils. She might even be lawfully deserted, and left to the unbroken power of the winds and waves. There would be an end of all command and all obedience on board. Such a state of things never could have been contemplated by the maritime law; and the very circumstance that the mate in such a case has been adjudged to succeed rightfully to the ordinary command as master, is decisive against its legal existence. In truth, if the law were so, it would be not less disastrous to the seamen themselves. They might be dismissed in a foreign port, at a distance from their homes, in a desert island, or in short at any other place, where the occurrence might take place; and left to work their way to their own country in the midst of every sort of hardship and peril. It is, therefore, not desirable, in any view of the matter, for any party, that such a principle should be recognized as law. We have no difficulty in declaring, that the shipping articles were not dissolved by the change of the master; and that the maritime law still held it obligatory upon all the parties. The new master, succeeding to the old by the authority of the owner, became the lawful master for the voyage; and the seamen were bound to obey him, as such, during the voyage. This, indeed, has been repeatedly adjudged in this court in the cases cited at the bar, and others; and we see no reason to change our opinion.

As to the second point,—assuming that there was a mutual co-operation and combination of the defendants not to do duty, but to disobey the master, the question is, whether it amounts to an endeavour to commit a revolt in the sense of the statute. We are clearly of opinion, that it does. What is a revolt? It is an open rebellion or mutiny of the crew against the authority of the master, in the command, navigation, or control of the ship. If the crew in a mutiny were to displace him from the actual command of the ship, and appoint another in his stead, that would clearly be a revolt. It would be an actual usurpation of his authority on board of the ship, and an ouster of him from the possession and control of it. But there may be a revolt independent of the appointment of another to the command. If the crew should compel the master against his will, by threats or otherwise, to navigate the ship, or manage her concerns, according to their own directions, and prevent him from the free exercise of his own judgment, that would be an effectual usurpation of the command of the ship, and in the sense of the law, a revolt. In short, whenever, by the overt acts of the crew, the authority of the master in the free navigation or management of the ship, or in the free exercise of his rights and duties on board, is entirely overthrown, and there is, intentionally caused by such acts, a suspension, actual or constructive, of his power of command, it is a revolt of the crew. Direct, positive force upon the master is not essential; positive constraint or imprisonment of the master is not essential. A total refusal to perform any duty on board, until he has yielded to some illegal demand of the crew, when it has produced de facto a compliance, or a suspension of his power of command, is a revolt. And any act, or attempt, or combination to produce such a revolt, is an endeavour to make a revolt. These cases are not put as the only ones, in which a revolt may exist. They are put merely as examples and illustrations of the doctrine. If an army by a general combination refuse obedience to all orders of their commander, it is just as much a revolt, as if they had by the same combination compelled him to obey the orders of an usurper. The offence is in each case the same in its essence, though it may differ in the degree of aggravation. In each case there is a total suspension of his power of command by the illegal acts. The doctrine, which is here stated, has been often held in this court, and particularly in the cases of U. S. v. Smith [Case No. 16,337], and U. S. v. Hemmer [Id. 15,345]. We see no reason to doubt it, or to depart from it.

But it is supposed, that the case of U. S. v. Kelly, 11 Wheat. [24 U. S.] 417, inculcates a different doctrine. If it does, we are certainly bound by it. But I feel the utmost moral certainty, that such was not the understanding of the court itself; and though there is some slight foundation in the language used in that opinion for the present argument, a close examination of it will not justify the conclusion, that it is at variance with what we have now asserted as our own opinion. That case was brought before the court for the mere purpose of ascertaining, whether, as the act of congress does not define the offence of endeavouring to make a revolt, it was competent for a court of law to give a judicial definition of the offence. There had been a doubt expressed elsewhere, whether it was not indispensable, that congress should have defined what a revolt was, before the court could proceed to punish it; and that doubt had been followed up by a decision, that such a definition by congress was indispensable, and that decision had led to an acquittal of the person charged with the offence. So that the act of congress, so far as it touched this offence, was reduced to a nullity. My learned brother, Mr. Justice Washington, and the district judge of Pennsylvania, thought it their duty, under such circumstances, to bring the point, when it arose before them, to the supreme court for a final decision. And the supreme court overruled the decision above alluded to, and held

it competent for the court to give a definition of the offence, and punish it under the act of congress. Mr. Justice Washington, in delivering the opinion to the court on that occasion, said, that "the offence consists in the endeavour of the crew of a vessel, or any one or more of them, to overthrow the legitimate authority of the commander, with intent to remove him from his command." But this language does not import, that the removal from the command must be by physical force. The court look to the fact, whether there is an overthrow of the master's authority, or a removal of him from his command. intended; and not to the mode by which it is accomplished. The overthrow of authority may be just as complete, the removal from command may be just as effectual, by a universal disobedience to all orders, producing an actual suspension of the master's authority or command, as by actual force, or personal imprisonment, or driving the master on shore. The subsequent language of the court demonstrates, that it had in its view, in this part of the opinion, not only cases of forcible, but of constructive, removal from command; for the court go on to say, "or against his will to take possession of the vessel by assuming the government and navigation of her, or by transferring their obedience from one lawful commander to some other person." Now these passages show, that the court, by using the disjunctive "or," had in contemplation some classes of cases, not minutely specified in the preceding clause. If no other acts but such as the disjunctive clauses embraced were endeavours to make a revolt, in the sense of the act, the preceding clause was wholly unnecessary. But it was perfectly proper, if the latter clauses were only illustrations of a few cases comprehended under the more general description in the first clause. At all events, no person can say, that the definition contained in the first clause is to be rejected; and in the view we take of its true exposition, there is nothing in it, that trenches upon the opinions held by this court. In truth, I consider the definition given by the supreme court not to have been designed to have more than an affirmative operation; that is, to declare that such acts would amount to the offence, and not negatively, that none others would.

I was one of the judges who concurred in the opinion given in the supreme court; and it was matter of utter surprize to me, when I first learned that such a narrow interpretation of it, as is now contended for, had been contended for at the bar. I have reason to know, that it was equally a surprize upon others of my brethren who concurred in that opinion.

Upon the whole, thinking as we do, that there is no real repugnancy between the opinion of the supreme court and our own, we adhere to the latter, and give it as law to the jury.

· Verdict guilty, and sentence accordingly.