## UNITED STATES v. HUFF.

*(Circuit Court, W. D. Tennessee.   October 2, 1882.)*

1. CRIMINAL LAW—REVOLT ON STEAM-BOAT—MATE—CREW—REV. ST. §§ 5359, 5360.

   A statute punishing "any one of the *crew* of an American vessel" for making revolt, or endeavoring to make revolt, on board, within the admiralty and maritime jurisdiction of the United States, embraces the *mate* and all other officers inferior to the master.

2. SAME—MATE DISRATED OR DISCHARGED.

   Nor will the fact that the master displaces the mate from his position on the boat and discharges him, release the latter from the operation of these statutes while he remains on board, and certainly not while he is acting, or claiming to act, as an officer.   Every member of the crew, while on board, is bound to obedience and subordination to all proper control and discipline.

3. SAME—CONSTRUCTION OF STATUTES — ACT APRIL 30, 1790, §§ 8, 12—ACT MARCH 3, 1835.

   The act of March 3, 1835, carried into the Revised Statutes as sections 5359-60, enlarges the original act of April 30, 1790, by adding distinct offenses to the "endeavor to make a revolt" contained in it.

4. SAME—REVOLT—ENDEAVOR TO MAKE REVOLT—DISOBEDIENCE—RESISTANCE.

   These statutes do not include every case of simple passive *disobedience* of the master's orders on the part of one of the crew, not participated in by others; but do embrace every case of *resistance* to the free and lawful exercise of the master's authority, when accompanied by force, fraud, intimidation, violence, a conspiracy among the crew, or concerted action in such resistance or disobedience by one of them.

5. SAME—UNLAWFUL CONFINEMENT OF MASTER.

   An unlawful confinement of the master, under section 5359, is not restricted to a physical confinement of his person.   If the master is prevented or restrained by force, intimidation, or threats of bodily injury from the free use of every part of the vessel in the performance of his functions as master, it is a confinement within the meaning of this statute.

Criminal Informations.

Two informations were filed against this defendant by the district attorney after a preliminary examination before one of the commissioners of this court.   The first is drawn under section 5359 of the Revised Statutes, and contains four counts, in substance as follows: That the defendant on, etc., at, etc., "did endeavor to make a revolt on board the steam-boat Henry Lourey, whereof one John H. Long was then and there master, by then and there resisting the said master in the free and lawful exercise of his authority and command on board," the defendant at the time being mate of the boat.   The second count differs from the first only in charging an "endeavor to make a mutiny on board" instead of a revolt.   By the third count it is charged

that defendant "did unlawfully confine the said master;" and in the fourth that he "did solicit certain of the crew of said steam-boat * * * to disobey and resist the lawful orders of the said master, and to refuse and neglect their proper duty on board."

The other information, containing three counts, charges violations of section 5360 of the Revised Statutes. In the first count it is charged that defendant "did make a revolt on board said steam-boat, by then and there unlawfully and with force resisting the said master in the free and lawful exercise of his authority and command on board said steam-boat." The second count is like the first, except that the resistance is alleged to be "by intimidation" instead of "with force;" and the third charges that defendant "did make a revolt and mutiny on board said steam-boat, by then and there unlawfully, and with force and by intimidation, resisting and preventing the said master in the free and lawful exercise of his authority and command on board," etc. At the trial of these cases the following special verdict was found by the jury in each case:

"We, the jury in the above-entitled case, do find the following facts as a special verdict: That on or about the thirtieth day of April, A. D. 1882, the steam-boat Henry Lourey, which was and is an American vessel, owned by American citizens, was employed and engaged in commerce and navigation on the Mississippi river between St. Louis, Missouri, and New Orleans, Louisiana, and intermediate ports; that John H. Long was master of said steam-boat, and that the defendant was mate thereof under a contract of monthly wages made at St. Louis, no time of service being specified nor shipping articles signed; that in the night of said day, on the up trip of the boat, above Memphis, and between the Tennessee shore of said river and Check island, (said island being a part of the state of Tennessee,) the outside starboard barge of the tow of said boat struck a snag, which tore out its front end to within six or eight inches of the water line; that the master, mate, carpenter, watchman, and others of the crew at once ran out on the tow, the mate being just ahead of the master, and that the master, on ascertaining the nature of the accident, ordered the injured barge to be swung round end for end, but the mate said the barge could be repaired, and that there was no need of turning it round; that the master then stepped back upon the barge next to the injured one (the mate remaining on the injured barge with some of the crew) and gave orders to the mate as to the handling of the lines in swinging the barge, but the mate did not obey the master's orders in handling the ropes. Then the master gave the order, 'Hurry along with the lines quick,' when the mate answered, 'We are hurrying.' The master said, 'It doesn't seem like it;' and the mate replied, 'You are a G—d d——d liar, puppy, and low-down son of a b——h.' Upon this insulting language passed between the two, when the master finally said, 'Lee, you're the d——st meanest man I ever saw. I've tried to make a man of you, but you and I can't steam-boat together any longer. Come off the barges upon the boat and I will pay you off. You are

no longer mate.' This the mate refused to do, saying he would shoot the master or any man who attempted to remove him from the barges; whereupon the master said to him, 'If nothing but fight will do you, Lee, as I am unarmed and you are a bigger man than I am, I will get you a knife and take one myself, and we will go out on the bank and cut this matter out.'

"The master then ordered the mate to give no further instructions to the men, which he refused, and continued to give them instructions, and ordered the men not to obey the commands of the master, as he (the defendant) was mate, and proposed to act as mate. Thereupon the boat was landed on the east shore of Cheek island, when the master, having made fast the barges to the bank, again ordered the mate to come aboard the boat, that he might return with him to Memphis and be paid off. This the mate stoutly refused to do, swearing that the master hadn't crew enough to take him off the barges, not even if the whole steam-boat were a cannon; that he was mate of that steam-boat, and nobody could remove him from that position on the boat; that he intended to stay, and die on those barges; and that the only way the master could get him off was to blow him off. The mate then called upon several of the crew to come upon the barges with him, but the master ordered them to remain on the boat, which they did. The master then came to Memphis with the boat to obtain the assistance of the United States marshal, leaving one or two men in charge of the tow. The mate, however, called upon different men to come off the boat upon the barges to help guard them than the master ordered, but the men obeyed the master. The master left his boat and came to Memphis for assistance, because he felt it unsafe to proceed on the voyage with the defendant on board."

*John B. Clough*, Asst. U. S. Atty., for the United States.

*John T. Moss*, for defendant.

HAMMOND, D. J. Sections 5359 and 5360, under which these informations are drawn, prescribe the punishment of offenses committed by "any one of *the crew* of an American vessel," etc., and it is argued for the defendant here that inasmuch as he is charged by the pleadings and shown by the special verdict to have been *the mate* of the steam-boat at the date of the offense, he is not obnoxious to this statute, because the mate, being an officer of the boat, is not included in the term "crew." By title 52 of the Revised Statutes, prescribing the regulations for steam-vessels, masters, chief mates, engineers, and pilots are required to be licensed as officers, and penalties are attached for their serving without proper license. Qualifications are prescribed by this title for such officers, a system of examinations provided for ascertaining their qualification, and an oath must be taken before the granting of the license for the faithful and honest performance of duty by the licensee, and boards of inspectors are given power under the statute to investigate acts of incompetence and misconduct of these licensed officers. Rev. St. §§ 4438, 4452. But

these and similar provisions do not create any new or other officers on shipboard than existed before the passage of the acts containing them, and a master or mate of a vessel, for instance, has no further, other, or different authority by virtue of his license, and the compliance with the regulations of such statutes, than he would otherwise have when in fact acting in such capacity on board.

The evils to be prevented and punished by these sections of the Revised Statutes against revolt and mutiny are just as great, and would naturally be attended with graver consequences, when the offense is committed or engaged in by any of the officers inferior to the master, than when the common seamen merely are engaged in the unlawful enterprise; and for obvious reasons. By the construction contended for, the mischiefs to be remedied by the statute would, in many instances, not be reached; and while I, of course, yield to the doctrine that penal statutes are to be strictly construed, yet such construction is not of necessity the most restricted one that can by any possibility be adopted. *Schooner Industry*, 1 Gall. 117. And where the case is within the language of the statute and the evident intention of congress, and the remedial influence of the enactment, courts are bound to adopt such construction as will give effect to the legislative intent. But, on authority, I cannot adopt the argument of the defendant in this regard. The question first indirectly arose in *U. S.* v. *Sharp*, 1 Pet. C. C. 118, 131, decided by Justice Washington in 1815, which was an indictment for making a revolt and confining the master under the act of 1790. The defendants were shipped by an American consul, on the homeward voyage of the vessel, under an act of congress providing passage at the expense of the United States of foreign seamen to a port of the United States, and the court held that they were within the act, although not shipped under a contract by the master.

In *U. S.* v. *Savage*, 5 Mason, 460, under the same act of 1790, the defendant was mate of the ship, and the point was directly made that he was not within the provision of the act; but Justice Story ruled otherwise on the trial, holding "that the mate is a seaman, and is to be so deemed for all the purposes of the statute," though he reserved the question for further consideration in case the defendant was convicted; but the trial resulted in an acquittal.

In 1838 the case of *U. S.* v. *Winn*, 3 Sumn. 185, was decided by the same learned judge, after full argument on motion for a new trial. Defendant was indicted under a section punishing " any master or other officer of an American ship * * * [who] shall * * *

beat, wound, or imprison any one or more of the crew of such ship or vessel," etc. The defendant was master, and the facts at the trial established an imprisonment of the chief officer or mate, and the only question considered in the able opinion was whether *the mate* was one of *the crew*, and, "after much deliberation," the court decided the question in the affirmative. In illustrating his argument in that case, Judge Story cites the statutes under which the defendant, Huff, is now being prosecuted, and uses this language:

"Why is not an officer, not being the commanding officer, to be deemed within the purview of the section? The offense would be even more reprehensible when committed by a subordinate officer than by a common mariner. So far from there being any public or presumed policy in exempting such an officer from the reach of the penalties of the section, there would seem to be a very strong ground for holding him within it. Why, then, should the general import of the word 'crew' be restricted in his favor?" See, also, *Bailey* v. *Grout*, 1 Ld. Raym. 632.

Another position taken for the defendant, in argument, is that after the master said to Huff, "Come off the barges upon the boat and I will pay you off; you are no longer mate," the defendant from that moment ceased to be mate, was no longer one of the crew, and was thenceforth bound to no obedience to the master, and therefore in no event amenable to these statutes for anything that afterwards occurred, although his conduct might otherwise render him guilty. The cases already cited show conclusively, to my mind, that the authority of the master on shipboard cannot be made to depend on so unstable a foundation as the logical conclusions to which such an argument would lead. It is conceded here that, under the contract of shipment made between the boat and the defendant, the right to terminate the service as mate of the steam-boat belonged equally to the master and to the defendant, under proper and reasonable circumstances. This is undoubtedly true; and had the mate at the inception of the difficulty said, "I am no longer mate," and thereupon proceeded to create a revolt on board, he could not, according to the argument, be punished under these statutes. Of course, such a doctrine cannot be acceded to. While any member of the crew remains on board, no matter in what capacity, he is bound to obedience and subordination to all proper control and discipline to the ship's officers in authority over him, and any other rule would entirely subvert the discipline of the ship and the management of its crew

In *U. S.* v. *Savage, supra,* this question was presented to the court, and in reply to the argument Judge Story says:

"How far has the master right to displace the mate? We are of opinion that he has this authority absolutely, and the mate is in such case bound to submit. The master is the lawful agent of the owner for this purpose, and the authority is intrusted to him from motives of great public policy to secure due subordination on board, and to promote the vital interests of navigation and trade. * * * If he displaces the mate, the latter is bound to abstain from all further exercise of his ordinary authority on board the ship. * * * But, like every other person on board, he is bound to submit to all reasonable commands, and to conduct himself in a quiet and inoffensive manner. Being no longer in office he is to be deemed a *quasi* passenger, and his remedy for any grievance lies by an appeal to the laws of his country for redress, and not by any attempts to avenge his wrongs, or to inflict personal chastisement on the master." See, also, *U. S.* v. *Sharp, supra.*

But the principal question for determination by the court in these cases is whether the acts and conduct of the defendant make him in any view guilty as charged in these informations. For the defendant it is strenuously insisted that under any, even the most unfavorable, view of his conduct, it cannot be held to amount to the gravity of a revolt, or of an endeavor to incite revolt; while for the government it is contended that any act of mere disobedience of the master's orders, accompanied by intimidation or force, is within the statute. Section 8 of the original act of April 30, 1790, provided that "if any seaman * * * *shall make a revolt in the ship,* every such offender shall be deemed, taken, and adjudged to be a pirate and felon, and being thereof convicted shall suffer death;" and section 12 of said act provides that "if any seaman *shall confine the master* of any ship or other vessel, or *endeavor to make a revolt* in such ship, such person or persons so offending, and being thereof convicted, shall be imprisoned not exceeding three years, and fined not exceeding $1,000." 1 St. at Large, 114, 115.

In 1826 the supreme court of the United States, in *U. S.* v. *Kelly,* 11 Wheat. 417, (1826,) which came before the court on a certificate of division on the question whether it is competent for the court to give a judicial definition of an "endeavor to make a revolt," decide the point in the affirmative and say: "We think the offense consists in the endeavor of the crew of a vessel, or any one or more of them, to overthrow the legitimate authority of her commander, with intent to remove him from his command, or against his will to take possession of the vessel by assuming the government and navigation of her, or by transferring their obedience from the lawful commander to

some other person." Justice Washington delivered the opinion of the court, and was one of the judges before whom the case was originally tried. S. C. 4 Wash. C. C. 528. But in *U. S.* v. *Haines,* 5 Mason, 272, (1829,) Mr. Justice Story, who, as one of the justices of the supreme court concurred in the above definition; in reply to the argument of defendant's counsel uses this language: "In truth, I consider the definition given by the supreme court not to have been designed to have more than an affirmative operation; that is, to declare that such acts would amount to an offense, and not negatively, that none others would."

By the act of March 3, 1835, (4 St. at Large, 775, 776,) entitled "An act in amendment of the acts for the punishment of offenses against the United States," the provisions composing sections 5359 and 5360 of the Revised Statutes were enacted, which are as follows:

"Sec. 5359. If any one of the crew of any American vessel, on the high seas or other waters within the admiralty and maritime jurisdiction of the United States, endeavors to make a revolt or mutiny on board such vessel; or combines, conspires, or confederates with any other person on board to make such revolt or mutiny; or solicits, incites, or stirs up any other of the crew to disobey or resist the lawful orders of the master or other officer of such vessel, or to refuse or neglect their proper duty on board thereof, or to betray their proper trust; or assembles with others in a tumultuous or mutinous manner; or makes a riot on board thereof; or unlawfully confines the master or other commanding officer thereof,—he shall be punished by a fine of not more than $1,000, or by imprisonment not more than five years, or by both such fine and imprisonment.

"Sec. 5360. If any one of the crew of an American vessel on the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States, unlawfully and with force, or by fraud or intimidation, usurps the command of such vessel from the master or other lawful officer in command thereof; or deprives him of authority and command on board; or resists him in the free and lawful exercise thereof; or transfers such authority and command to another not lawfully entitled thereto,—he is guilty of a revolt and mutiny, and shall be punished by a fine of not more than $2,000, and by imprisonment at hard labor not more than 10 years."

The act of 1835 was passed "in amendment" of statutes already in existence. It defines the original offense of making "*a revolt in the ship*" to consist (1) of usurping from the master the vessel's command; (2) depriving him of authority and command; (3) resisting or preventing him in the free and lawful exercise thereof; or (4) transferring such authority and command to one not entitled to it. And it enlarges the "*endeavor to make a revolt in the ship,*" as contained in the act of 1790, by adding as distinct offenses a conspiracy to make

such revolt; a solicitation, etc., of others of the crew to disobey or resist the master; an assemblage with others in a tumultuous or mutinous manner, and the making of a riot on board; while the offense of unlawfully confining the master is the same in both acts, except that the act of 1835 extends this offense to the unlawful confinement of any "commanding officer" on board.

I cannot accede to the argument of the defendant's counsel, therefore, that the Revised Statutes above quoted contain no other or further offenses than the original act. While this may be true as to section 5360, which merely defines what shall constitute a revolt or mutiny, the argument cannot, in my judgment, avail as to the construction of section 5359, especially in view of the definition of the "endeavor to make a revolt" as contained in *U. S.* v. *Kelly,* 11 Wheat. 417, and which, it is urged, is the only test by which the section can be construed. The reported cases, decided under the act of 1835, and which I have carefully examined, are *U. S.* v. *Peterson,* 1 Wood. & M. 305; *U. S.* v. *Staly,* Id. 338; *U. S.* v. *Forbes,* Crabbe, 558; *U. S.* v. *Seagrist,* 4 Blatchf. 420; *U. S.* v. *Cassedy,* 2 Sumn. 582; *U. S.* v. *Winn, supra;* *U. S.* v. *Nye,* 2 Curt. 225; *U. S.* v. *Almeida,* Phila. 1847, cited in Whart. Prec. Indict. 724. Of these cases, *U. S.* v. *Forbes* was an indictment for a revolt simply against a single seaman, who "refused to do duty" and killed the mate in the latter's attempt to arrest him. The defendant was convicted, and sentenced to six years' imprisonment. In his charge to the jury Judge Randall defines revolt in the very language of the supreme court in *U. S.* v. *Kelly,* and no reference whatever is made to any distinction between the act of 1790 and that of 1835.

In *U. S.* v. *Peterson* four of the crew were indicted for "resisting the master with force while in the free and lawful exercise of his authority," (section 5360,) and for "assembling together in a tumultuous manner," (section 5359;) and the question now under consideration was there presented for adjudication. In commenting on the cases decided under the act of 1790, Judge Woodbury held that "the law now in force (act of 1835) made the mere resistance to the master's lawful authority punishable, and that to make them guilty of this offense it was not necessary that they should either deprive the master of his command or usurp it themselves or transfer it to another; but it was enough if he issued lawful orders, which they disobeyed, and with violence resisted their enforcement. * * * It is not sufficient to have no intention to assume command of the vessel or to destroy her, or to carry her off like pirates, but there must be no insub-

ordination, no disobedience, no violence towards those who, by law as well as contract, are to rule and not to be ruled on board the ship." The defendants were convicted and sentenced.

*U. S.* v. *Seagrist, supra*, was an indictment for an endeavor to make a revolt and mutiny on ship board, and contained three counts, charging offenses in almost identical language with the case at bar. In discussing the language of the act Judge Betts says:

> "It is practically unimportant whether the provisions * * * are expounded as so many instances or methods in which the offense of an endeavor to make a revolt may be manifested, or whether they are taken distributively and understood to be so many separate and distinct offenses, each being sufficient of itself to sustain an indictment. The three counts of this indictment are so framed as to secure to the United States the advantage of either construction."

The defendants in *U. S.* v. *Almeida, supra*, were indicted for making a revolt simply, and the indictment was drawn in accordance with the precedents under the act of 1790. In sustaining the motion in arrest of judgment, because the offense was not charged under the act of 1835, Judge Kane, in an exhaustive opinion, reviewing all the authorities, says: "In 1835, however, a new act of congress was passed, which, obviously referring to the language of the supreme court in Kelly's case, yet not adopting it, proceeded to declare what violations of law should thereafter be deemed to constitute the crime of revolt;" and his analysis of the statute classified the offenses into four categories, the first of which is "simple resistance to the exercise of the captain's authority." "It is impossible," says the learned judge, "to analyze the section as I have done without remarking that the offenses which it includes, however similar in character, differ widely in degree. The single act of unpremeditated resistance to the captain cannot be identified with his formal degradation from the command, still less with the usurpation of his station, without overlooking the gradations of crime and confounding the accidental turbulence of a heated sailor with the deliberate and daring and triumphant conspiracy of mutineers."

The case of *U. S.* v. *Cassedy* was an indictment of six of the crew for an endeavor to commit a revolt, and probably contained a count for conspiracy. The proof was that the chief mate succeeded to the command of the ship on account of the master's ill-health, and the defendants thereupon "refused to do any further duty on board." For this they were convicted under the charge of Judge Story. And *U. S.* v. *Nye, supra*, was a similar case against the entire crew, who

were convicted under proof that, on account of a change of master and alleged unseaworthiness of the vessel, the men refused to go forward and make sail in answer to the order of the master, and "declared they would not go to sea in the vessel. They were perfectly sober and offered no violence. They only unitedly refused to obey the orders of the master to make sail or get the anchor." Judge Curtis presided at the trial. As the result of these cases and of my investigation of this subject I am well satisfied that the special verdict in these cases renders the defendant guilty of the offenses charged against him. And while I cannot think it was the intention of these statutes to make the courts of the United States a place to discipline every member of a ship's crew who is guilty of simple disobedience of the master's orders, I have no doubt that every case of mere resistance to his free and lawful exercise of authority and command on board is so punishable if accompanied by force, fraud, intimidation, violence, or a conspiracy among the men. *Disobedience* and *resistance* are not synonymous words in the construction of these provisions of the law; while the latter embraces the former, it implies much more, and requires an active element of opposition to authority in connection with the refusal or neglect to obey. A mere passive act of disobedience on the part of a single member of the crew, unaccompanied by any element of force, intimidation, or fraud upon the master or other officer in command, and free from all conspiracy with and incitement of others of the crew to join in the act, cannot, in my judgment, be a violation of either of these statutes. It is difficult to define, beyond the definitions of the statute, what particular acts would or would not be an incitement to revolt; and, perhaps, it is not desirable to have such particularity of definition, lest, like the attempt to define fraud, it should result in encouraging an evasion of the statute. Much depends upon the circumstances of the case and the intention of the accused at the time. If his conduct, taken altogether, shows that his purpose is to actively resist the master, or to excite his comrades and procure their assistance in the act of resistance and disobedience he is determined on or engaged in, it subjects him to the punishment of this statute, as well as all who unite or conspire with him by yielding to such solicitations, whether their conduct results in an accomplished and successful revolt against the master or not. These views are otherwise sustained by cases on other statutes of a somewhat similar nature. Section 5398, *ex. gr.*, punishes "every person who knowingly and willfully *obstructs, resists,*

or *opposes* any officer of the United States in serving or attempting to serve" process, etc.

In the case of *U. S.* v. *Lowry*, 2 Wash. C. C. 169, resistance and obstruction of the marshal in serving writs of possession were charged, and the proof exactly corresponds with that portion of the special verdict here relied upon to support a conviction for resistance, viz.: "Defendants were armed, threatened to kill the officer if he attempted to dispossess them, declaring they would lose their lives rather than permit the execution of the writs, in consequence of which the marshal was .prevented." Justice Washington, in deciding that case, said: "The offense * * * is complete when the person in possession refuses, and by threats of violence, which it is in his power to enforce, prevents the officer from dispossessing him;" and again, in reply to the argument that a mere threat to resist is not an offense, "If, when the officer having the writ proceeds to the land and is about to execute it, such a threat is made by a person retaining the possession, accompanied by the exercise of force, or having the capacity to exercise it, in consequence of which the officer cannot do his duty," the offense is complete. "The officer is not obliged to risk his life or expose himself to personal violence; it is enough that he is prevented by the exercise of force, or the threat of force by one in condition to execute it, from proceeding in the lawful exercise of his functions. It is not necessary for him to proceed to the length of a personal conflict with the defendant." So, in *U. S.* v. *Lukins*, 3 Wash. 335, which was an indictment for resistance of the officer, the same learned judge, in charging the jury, uses this language: "It was the duty of the defendant to come with the officer, and if he says he will not come, and does not come, this is a resistance of the officer within the prohibitions of the law, and no excuse will serve him;" the facts of the case being that, "on the marshal's attempting to execute the warrant, the defendant resisted in a violent and abusive manner, refusing to accompany him."

Applying the foregoing principles to the facts found by the special verdict here, we find persistent and repeated acts of deliberate and willful disobedience of the master's commands on the part of this defendant, accompanied by gross and insulting language, threats of violence and killing, and this, too, from a man armed and prepared to carry his threats into execution, besides an endeavor to prevent the crew from obeying any of the master's commands. And such conduct of the defendant was continued and persisted in until the

master was compelled to desist from a further prosecution of his voyage, leave his tow, and return to the city for the assistance of the officers of the law, deeming it unsafe to proceed. That an actual revolt on board did not occur, even under the older definitions given by the courts of that term, was due, not to the want of effort on the part of the defendant to produce it, but to the fact that the crew were true to the master and loyal in the performance of their duty. One of the counts in the indictment under section 5359 charges an unlawful confinement of the master. The confinement forbidden by the statute need not necessarily be a physical confinement of the master's person by depriving him of the use of his limbs, or shutting him in the cabin. If he is prevented by either force or intimidation from the free use of every part of the vessel, (*U. S.* v. *Sharp,* 1 Pet. C. C. 118,) or by threats of bodily injury in the performance of his proper functions as master, (*U. S.* v. *Smith,* 3 Wash. C. C. 78,) or if he is in any way restrained by conduct on the part of his crew, or any of them, such as would reasonably intimidate a firm man, (*U. S.* v. *Bladen,* 1 Pet. C. C. 213,) in every such or like case it is in law a confinement. *U. S.* v. *Thompson,* 1 Sumn. 168; *U. S.* v. *Hemmer,* 4 Mason, 105; *U. S.* v. *Savage,* 5 Mason, 461; *U. S.* v. *Henry,* 4 Wash. C. C. 428; 2 Whart. Am. Crim. Law, §§ 2872*a*, 2872*b*; 3 Jac. Fish. Dig. 3560; *Regina* v. *Jones,* 11 Cox, C. C. 393; *Regina* v. *McGregor,* 1 Car. & K. 429; *Rex* v. *Hastings,* 1 Moody, Cr. C. 82; 1 Russ. Cr. 92; 3 Archb. Crim. Pr. & Pl. 485, (Waterman's notes.)

### JUDGMENT.

The judgment, therefore, on the special verdict will be that the defendant is guilty of the offenses as charged in the informations, and it is so ordered.

NOTE. In the celebrated charge of Sir Lionel Jenkins, that ancient repository of curious learning concerning the criminal jurisdiction of the admiralty, he says: "You are to inquire of all mutinies, riots, fightings, bloodshed, maiming, cursing, swearing, blaspheming, in any ship or vessel, within the flowing and reflowing of the waters, particularly of such mariners as have assaulted their masters, being disobedient and rebellious against their lawful commanders; as also such masters as treat their mariners inhumanly, and do not pay them the wages they have honestly earned." 2 Browne, Civ. & Adm. Law, 485, 486.

See Desty, Ship. & Adm. §§ 193, 194.