## Case No. 14,470.

### UNITED STATES v. ASHTON et al.

[2 Sumn. 13.] [1]

Circuit Court, D. Massachusetts.   Oct. Term, 1834.

SEAMEN—INDICTMENT FOR REVOLT—COMPELLING MASTER TO RETURN—SEAWORTHINESS — BONA FIDES.

1. On an indictment for an endeavor to commit a revolt against section 12 of the crimes act of 1790, c. 36 [1 Story's Laws, 85; 1 Stat. 115, c. 9], it is a sufficient defence of the parties accused, that the combination charged, as an endeavor, was to compel the master to return into port for the unseaworthiness of the vessel, if they act bona fide and the vessel is actually unseaworthy.

[Cited in The Moslem, Case No. 9,875; U. S. v. Nye, Id. 15,906; The Shawnee, 45 Fed. 770.]

2. So if they act bona fide and upon reasonable grounds and apparent unseaworthiness, and it is doubtful, whether the vessel be unseaworthy or not.   But if the vessel, in such case, be clearly seaworthy, it is no defense.

Indictment against the defendants [James Ashton and others] for an endeavor to commit a revolt on board the ship Merrimack, of Boston, on the high seas.   Plea, not guilty.   At the trial it appeared, that the ship sailed from Boston on Saturday, 23d of August, 1834, on a voyage to Rio Janeiro, under the command of Capt. Eldridge.   She was then in a leaky condition, and some efforts had been made by the captain to conceal the extent of the leakage from the crew at the time of their shipment and coming on board.   The ship was twenty-nine years old.   The crew, on discovering the leak, in going out of port, expressed a wish to the captain to return and have repairs made.   The captain declined; but said if the leak increased he would return.   On Wednesday, the 27th of August, the vessel encountered a gale, and strained very much; and the crew were up all the night pumping, and were much exhausted.   The gale still continued, with every appearance of a continuance.   The crew then conversed together, and went to the captain, and requested him to return to Boston to repair; and expressed a firm belief, that the ship was unseaworthy, and that they were all in imminent danger of their lives.   The captain declined; but proposed, that they should keep on, and, if necessary, he would stop at the Western Islands for repairs.   The crew insisted, that he ought to return back to Boston, and that the hazard of proceeding on the voyage was imminent.   And then finding, that the captain persisted in going on the voyage, declaring, that he thought the vessel seaworthy, they refused to do duty any further, and seceded, and remained below several hours, during which time the gale increased, and the ship was in

[1] [Reported by Charles Sumner, Esq.]

great danger.   The captain, at length, in order to induce the crew to return to duty, agreed to return to Boston; and accordingly he wore ship and returned to Boston, where he arrived on the ninth day after her departure.   The crew at all other times during the voyage and in all other respects conducted themselves unexceptionably.

There was a good deal of evidence, at the trial, as to the seaworthiness of the ship. The chief mate swore, that in his opinion she was seaworthy.   The second mate swore she was not.   And there was the testimony of a number of highly respectable witnesses, who had examined the ship before her departure, and who affirmed that she was old and rotten, and in very bad condition, and wholly unseaworthy in all respects; and in their testimony they entered into the particulars of her defects.   On the other hand, one of the owners testified, that she was bought in July, 1834, for $2,500, and that about $1,000 had been laid out upon her in repairs; and that the owners believed her seaworthy for the voyage; and policies of insurance had been underwritten on her cargo for the voyage, after an examination made of her by one of the officers of one of the insurance companies in Boston; that after some slight repairs she had again gone to sea with the same captain and a new crew, who made no objection; and that before her last departure she had been surveyed and pronounced to be seaworthy. No imputation or suggestion of fraud or misconduct was cast upon the owners.   On the contrary, the counsel for the defendants expressly disclaimed any ground of this sort.

In the course of the trial, Mr. Dunlap, Dist. Atty., objected to the admission of any evidence to establish the unseaworthiness of the ship as irrelevant to the matter in issue, upon the ground, that unseaworthiness would constitute no defence to the charge in the indictment.   But the court, after hearing Shipley & Moore, for defendants, overruled the objection, and admitted the evidence.

Upon the posture of the facts, as disclosed in the evidence, a doubt having been suggested by the court, whether the evidence supported the indictment, the case was briefly argued to the court by Mr. Dunlap, for the United States.

STORY, Circuit Justice.   I do not think that the act for the government and regulation of seamen in the merchants' service (Act 1790, c. 56 [1 Story's Laws, 102; 1 Stat. 131, c. 29]) has any bearing on the present case.   The third section of that act merely provides for the case, where the mate and a majority of the crew of a vessel bound on a foreign voyage, after the voyage is begun, and before the vessel shall have left the land, shall discover the vessel to be too leaky or otherwise unfit to proceed on the voyage; and under such circumstances it makes it the duty of the master to return to port.   It does not, in the slightest man-

ner, trench upon the general rights and duties of the seamen under the maritime law; but merely imposes an absolute duty on the master in the case specified. All other cases and circumstances remain, therefore, as they were before, to be governed by the general principles of law. In the present case the combination to resist the authority of the master is clearly established; and unless the seamen were, by the circumstances, justified in compelling the master to return home, the offence charged in the indictment is fully made out; and the onus is on the seamen to establish the justification. If the ship was at the time clearly seaworthy, and fit for the voyage, whether the seamen acted by fraud, or by mistake, or upon a fair but false judgment of the facts, it seems to me the offence was committed. If, on the other hand, the ship was at the time clearly unseaworthy and unfit for the voyage, they were fully justified in insisting upon her return home: and were guilty of no offence. The law deems the lives of all persons far more valuable than any property; and will not permit a master, under color of his acknowledged authority on board of the ship, from rashness or passion or ignorance, to hazard the lives of the crew in a crazy ship, or compel them to encounter risks and perform duties, which are so imminent and overwhelming, that they can escape only by the most extraordinary chances, and, as it were, by miraculous exertions. If he should order them into a boat on the ocean, at a time when they could scarcely fail of being swamped or foundered, they would not be bound to obey. His commands, to be entitled to obedience, must, under the circumstances, be reasonable. The proposition cannot for a moment be maintained, that the crew are bound to proceed on the voyage in an unseaworthy and rotten ship, at the imminent hazard of their lives, merely because the master and officers choose in their rashness of judgment to proceed. It is true, that in all cases of doubt the judgment of the master and officers ought to have great weight, and from their superior intelligence, ability and skill, it may be relied on with far more confidence than that of the crew. They are embarked in the same common enterprise and risks, and it cannot be ordinarily presumed that they will hazard their own lives in a vehicle, which is really unfit for the voyage. Still, if the case does occur, if they will insist on proceeding, no matter at what hazard to life, and the ship is unseaworthy, I am clear, that the crew have a right to resist, and to refuse obedience. It is a case of justifiable self-defence against an undue exercise of power. Neither of these cases is of any real difficulty. But the case of difficulty is this, —suppose the ship to be in that state, in which the presumption of apparent unseaworthiness really arises, and the crew bonâ fide act upon that presumption, and the jury should be of opinion, that they acted justifiably upon that presumption at the time; and suppose upon the trial it should turn out, (as in the present case it may) that there is real doubt, whether the ship be seaworthy or not; or upon the evidence the case is nearly balanced in the conflict of credible as well as competent testimony, and the jury should on the whole deem the preponderance of evidence just enough to turn the scale in favor of seaworthiness; but not to place it entirely beyond doubt—I ask, whether, under such circumstances, the crew ought to be convicted of the offence charged, having acted upon their best judgment fairly, and in a case where respectable, intelligent, and impartial witnesses should assert, that they should have done the same; and where even the jury themselves might adopt the same opinion, although there might be an error in the fact of seaworthiness, as established at the trial? I have great difficulty in coming to the conclusion, that under such circumstances the crew were guilty of the offence charged. I am aware of the dangers of not upholding with a steady hand the authority of the master; but I am not the less aware of the necessity of having a just and tender regard for life. Seamen, when they contract for a voyage, do not contract to hazard their lives against all perils which the master may choose they shall encounter. They contract only to do their duty and meet the ordinary perils, and to obey reasonable orders. The relation between master and seamen is created by the contract; but that relation, when created, is governed by the general principles of law. Unlimited submission does not belong to that relation. I have great repugnance to creating constructive offences, and especially where there is perfect integrity of intention. I am aware, that in some cases crimes may be committed independently of any supposed intention to do wrong. But in most cases, and I think in a case of this nature, the intention and the act must both concur to constitute an offence. There are cases even of the highest crimes, as of homicide, where an honest and innocent mistake in killing another, under circumstances of a reasonable presumption, though a mistaken one, that the party killed intended to kill the other party, when the latter will be excused by law.

I have had this subject a good deal in my thoughts during the progress of this trial, (and the point is certainly a new one); and the strong inclination of my opinion at present is, subject to be changed by any argument hereafter urged, that the defendants ought not to be found guilty, if they acted bona fide upon reasonable grounds of belief, that the ship was unseaworthy, and if the jury, from all the circumstances, are doubtful, whether the ship was seaworthy, or even in a measuring cast should incline to believe the ship seaworthy. If she was

clearly seaworthy beyond reasonable doubt, then the defendants ought to be convicted, for the facts of the combination and resistance are admitted.

Upon these suggestions of the court, the district attorney said. that his own opinion coincided with that of the court, and that he would enter a nolle prosequi. But he had thought it his duty to bring the case before the court. And the court said, that the case was very properly brought before it for decision.