## Case No. 15,905.
### UNITED STATES v. NUTT.
[See Case No. 15,904.]

---

## Case No. 15,906.
### UNITED STATES v. NYE et al.
[2 Curt. 225.][1]

Circuit Court, D. Massachusetts.  May Term, 1855.

SEAMEN—ATTEMPT TO REVOLT—APPOINTMENT OF MASTER—UNSEAWORTHINESS.

1. If seamen are induced to ship by a false representation as to the person who is to command, whether they are bound by the contract, quære. But the owners may change the master after they have shipped.

2. A combination by the crew to prevent the vessel from going to sea, pursuant to the order of the master, is an attempt to commit a revolt.

[Cited in U. S. v. Huff, 13 Fed. 637.]

3. If seamen have reason to believe, and do believe a vessel is unseaworthy before the voyage is begun, they may lawfully refuse to go to sea in her. But they must prove these facts.

[Cited in The Heroe, 21 Fed. 528.]

The four defendants [Alfred Nye and three others] were put on their trial for the offence of endeavoring to make a revolt, on an indictment found under second section of the act of March 3, 1835 (4 Stat. 776). The evidence showed that they were regularly shipped for a voyage from Boston to East Florida, in the brig Leghorn. The shipping articles which they signed named one Burgess as master; but it appeared that one Rose had been spoken of to one of the men, as master, before the articles were signed. He was expected by the owners to go as master, but before the articles were drawn up, Burgess was substituted in his place. The defendants constituted the entire crew. At the appointed time, the defendants were taken on board the brig by the shipping master; but when the pilot came on board, and orders were given to get the anchor and make sail, to go to sea, they all refused to do ship's duty, and declared they would not go to sea in the brig. In answer to the order of the master to go forward and make sail, they refused; and declared they would not go to sea in the vessel. They said the brig was not seaworthy, but specified no particular defect, and did not ask for a survey. They were perfectly sober, and offered no violence. They only unitedly refused to obey the orders of the master to make sail, or get the

anchor. There was evidence that the vessel was sea-worthy, and that after these men had been removed, a new crew was obtained, and the brig went to sea. There was other evidence that many of the rattlings were broken and the standing rigging required much repair; but it did not appear that it was in such a condition as to render it unsafe for the vessel to proceed on the voyage.

J. H. Prince, for the defence, contended that, the first section of this act had defined the offence of making a revolt; that mere refusal to do duty in a harbor, no force being used, or threatened, did not amount to that offence; and that the offence of endeavoring to make a revolt, described in the second section, was not committed, because the defendants attempted to do nothing but what they did, that is, refuse to do duty. He further insisted that, if the men were shipped under the belief that they were to go with Captain Rose, and this was held out to them as an inducement, without which they would not have engaged, they were not bound to go to sea with another master. He also insisted that, if the men honestly believed the brig was not sea-worthy, they were justified in refusing to go to sea in the brig.

These points were briefly spoken to by him and by Mr. Hallett, U. S. Dist. Atty.

CURTIS, Circuit Justice. Since the adjournment of the court I have looked into the authorities, and considered the points made at the bar. As to the change of master, there is no evidence that the men were induced to ship by a false representation that Rose was to go as master. If they were, it would deserve very serious consideration, whether they were bound by the contract. The evidence is, that Rose had been spoken of as master to one of the men, but not as certain to go; that Burgess had in fact been appointed, before the articles were signed, and his name is in the articles. Even if Rose had been master when the defendants shipped, the owners had power to change him for another. U. S. v. Haines [Case No. 15,275]; U. S. v. Cassedy [Id. 14,-745]. This point cannot avail the defendants.

The objection arising from the alleged defect of evidence to prove the offence described by the act of congress, is attended with more difficulty. The crimes act of April 30, 1790, § 12 (1 Stat. 115), made it an offence to "endeavor to make a revolt." It contained no other description of the offence, and no definition of a revolt. It was under this act, the cases of U. S. v. Haines [supra], U. S. v. Gardner [Case No. 15,188], and U. S. v. Barker [Id. 14,516], were decided. In the first of these cases, it was held that, a total suspension of the command of the master, by the illegal refusal of the men to obey any and all his orders, was a revolt; and that a combination so to refuse, followed by an ac-

tual refusal in some one instance, was an endeavor to make a revolt. And this continued to be the law laid down by this court in subsequent cases. The act of March 3, 1835, § 1 (4 Stat. 776), has defined the offence of revolt, and among other things which may constitute it, is "unlawfully, wilfully, and with force, or by fraud, threats, or other intimidations, deprive the master of his lawful authority and command." Now the argument is—that in this case, the men used no force or fraud, and uttered no threats, and did nothing to intimidate the master. But this does not meet the point. They are not indicted for making a revolt, but for endeavoring to make one; and therefore, though they did not make one, but did in fact deprive the master of his lawful authority, and this by means of a combination which embraced the entire crew, and left the master without means to enforce his authority, the question is, if this was not an endeavor to intimidate him; or if this was not so, whether their combination to refuse to do duty, if it existed, did not also include a combination to resist the lawful commands of the master, to make sail and go to sea. In the case of U. S. v. Cassedy [supra], Mr. Justice Story, in the trial of an indictment under this act, instructed the jury that the question was, "whether there was among the defendants a common confederacy to refuse to do further duty on board the ship, and to resist the lawful commands of the officers in regard to the sailing or preparation for the voyage." This would include a confederacy to resist by force, threats, or intimidations of any kind. The proper instruction in this case, I consider to be this: if there was a confederacy and combination by the defendants, to refuse to go to sea in the brig, and to prevent the brig from sailing, pursuant to the orders of the master, while they were on board, and this determination was made known to the master, there was an endeavor to commit a revolt, within the meaning of the act of congress. Reg. v. McGregor, 1 Car. & K. 429.

The other question, of the right of the crew to refuse to go to sea in the brig, on account of alleged unseaworthiness, was considered by Mr. Justice Story, in U. S. v. Ashton [Case No. 14,470]; and also by Mr. Justice Woodbury in U. S. v. Staly [Id. 16,374]. I think the correct rule is, that after the men have rendered themselves on board, pursuant to their contract, and before the voyage is begun, they may lawfully refuse to go to sea in the vessel, if they have reasonable cause to believe, and do believe, the vessel to be unseaworthy. But the presumption is that the vessel was sea-worthy; and the seamen must prove that they acted in good faith, and upon reasonable grounds of belief that the ship was not in a fit condition to go to sea, by reason of unseaworthiness. If they prove this, they are justified in their refusal, and are not guilty of any offence in this case.

The jury found the defendants guilty.

Before sentence, the court remarked that, though satisfied with the verdict, which affirmed the seaworthiness of the vessel, the evidence showed some of the standing rigging to have been in bad order; and that it was not a proper practice to send a vessel to sea, with the rigging in such a condition, as to impose on the crew the labor of very considerable repairs at the outset of the voyage; that though the conduct of the men was unjustifiable, it found one palliating circumstance, in the state of the rigging, and another, in the fact that they came on board sober, and fit for duty, and offered no actual violence to either of the officers. In addition to the imprisonment of fifteen days, already suffered, the sentence was, a further imprisonment of fifteen days.