## THE HEROE.

*(District Court, D. Delaware. August 11, 1884.)*

1. SEAMEN'S WAGES—STIPULATIONS—DISCHARGE.

Where seamen were employed on a steam-boat to make the run from Philadelphia to Port of Spain for a stipulated sum, and to have their passage paid on their return to the port of departure, and the vessel, after having gone a short distance to sea, was compelled to put back, and some of them were discharged by the captain because he had no further use for them, *held*, that they were entitled to be paid the full sum agreed upon for their wages.

2. SAME—LEAVING VESSEL—SEAWORTHINESS.

Two of the libelants having left the vessel on the ground that she was not seaworthy, *held*, that unseaworthiness justifies a crew in leaving a vessel, and

entitles them to the payment of their wages for the month or voyage; and that the discharge of seamen and unseaworthiness may be proved in the same manner as other facts are proved before a court or jury.

**3. SAME—STATUTORY PROVISIONS.**

Statutory provisions relating to the discharge of seamen, and the holding of surveys on vessels alleged to be unseaworthy, are not exclusive of other remedies than those therein contained.

In Admiralty.

*Bradford & Vandegrift,* for libelants.

*John M. Arundel,* for claimant.

WALES, J. Libel for wages and damages. The libelants shipped on board the Heroe, bound from Philadelphia to Port of Spain, in the island of Trinidad,—two of them in the capacity of quartermasters, two as firemen, and the remainder as seamen,—and they were to be paid for the run, $50, $45, and $40, respectively, and on their arrival at the port of destination were to have their passage paid to Philadelphia or New York. The Heroe is a side-wheel steam-boat, designed principally for river navigation, and this was her first voyage. She is of 102 tons burden, 110 feet long and 26 feet beam, provided with a single engine and a single furnace. The furnace was constructed for burning wood, but was temporarily adapted for the consumption of coal. She left Philadelphia on July 6th, last, with a crew of 14 all told. She was about 24 hours in making the breakwater, and after a short delay for some slight repairs to the machinery, put to sea and had gone as far as off Cape Hatteras when she was compelled to come to anchor for further repairs to the engine. Before reaching Hatteras it was found necessary to stop the engine every few hours to clean the fires. By this time, also, it had been discovered that the machinery worked badly, and the vessel could not make more than three and a half or four knots an hour. After repeated efforts to put the engine in good working order, and more than one unsuccessful attempt to proceed on the voyage, the vessel at one time having lost steerageway, becoming unmanageable, and the stock of coal being considerably reduced, it was decided to turn back and make Philadelphia or the nearest port. The Heroe had first arrived off Hatteras on July 10th, and returned to the breakwater on July 17th. Waiting here and at Cape May for orders from the owners, she was finally brought to Delaware City on July 26th. Between Cape May and Delaware City the three lower tiers of tubes of the boilers gave out, and the crown-sheet was split for the length of six inches. The steam-boat was provided with sails, but it was not pretended that they were sufficient for her navigation. The captain surmised that by removing the paddles he might have proceeded under sail. At Delaware City the two quartermasters left the vessel on account of her unseaworthiness, and on the ground that the voyage had been broken up and abandoned, and being refused payment of their wages filed their libel. Subsequently the firemen and seamen filed their libel for wages, alleging that the captain had discharged them. By agreement of counsel the testimony taken under

the first libel applies to the second, and both have been consolidated. I entertain no doubt of the fact of the discharge of the firemen and seamen. The testimony of the libelants establishes the fact, and the captain admitted to the marshal that he had no further use for the men; that they were at liberty to go; and he permitted them to take their effects from the vessel. The answer denies that the men were "regularly" discharged, but the proof is too clear for discussion that they were virtually and practically discharged, and a decree will be entered for the payment of their wages as stipulated in the shipping articles, less advances and credits. I have not been satisfied that they are entitled to any further compensation or damages. It is true, they expected to make the run out and return before August 1st, but they have not suffered a long detention.

The case of the quartermasters turns on a different question, to-wit, the unseaworthiness of the Heroe, and the deviation from and abandonment of the voyage for which they were engaged. They do not allege that the captain discharged them. The answer specifically denies unseaworthiness or abandonment, and claims that the Heroe was brought back to Delaware City "for the purpose of having her steam-engine put in proper order and repair, so as to enable said steam-boat to resume or proceed on her voyage to said Port of Spain," etc., "which repairs, as respondent has been informed, will be completed on or about Tuesday next, the fifth instant." "Sea-worthiness implies the ability of a ship or other vessel to make a sea voyage with probable safety; that is, that she shall be tight, stanch, and strong, properly manned, provided with all necessary stores, and in all respects fit for the intended voyage." Bouv. Law Dict. Confining the inquiry to the fitness of this vessel to make the run from Philadelphia to the island of Trinidad, a distance of 2,300 miles, the testimony, not alone of the libelants but of the captain and chief engineer, is conclusive. The vessel is well built for one of her class, and her officers appear to be experienced and competent, but there was such a defect in her machinery, owing to faulty construction, or the ill adjustment of its various parts, that the chief engineer reported at the time when it was decided to turn back that he could do nothing with the engine. The experiment of sending such a vessel on a voyage of 2,000 miles was somewhat hazardous, and the refusal of these libelants to stand by her is not remarkable. The vessel was altogether dependent on her engine for propelling power, and when that failed from faulty construction, or by reason of the negligence or want of skill on the part of the owners, the vessel could no longer be considered as fit for the voyage for which she was intended. A rotten or leaky hull or broken masts are no greater evidences of unseaworthiness than is a defective engine, under the circumstances surrounding this case. The libelants shipped on the Heroe on the faith that she was in all respects well found and provided as a steamboat should be, and when they had good reason to believe that she was

a failure, and that their lives would be endangered by again going to sea in her, their conduct in leaving cannot be considered as censurable. It is quite probable that the machinery may be rectified and made to work as originally designed, and the vessel ultimately reach its destination, but in the mean time are the libelants compelled to remain on board indefinitely, without additional compensation, and to forfeit their stipulated wages unless they make the run to Trinidad? Had the steam-boat encountered storms or head-winds, and her voyage been delayed by these or other perils of the sea, the libelants must have been without warrant or justification for their action, and it would have been their duty to remain on the vessel until the voyage was ended. But this is obviously a different case. She was not thwarted by the elements, but by reason of her own inherent defects. The engine and boiler of the Heroe will require considerable repair and alteration before she is fit for sea, and the evidence affords no satisfactory information when these repairs will be completed.

I think this vessel was unseaworthy from the facts already stated. The chief engineer testified that the air-pump was too small, and that the draughtsman of the machinery had made a mistake as to its size. The engine worked stiffly and slowly, being new and untried. The speed never exceeded, if it reached, five knots an hour. The furnace was not intended for wood-burning, and before the officers had decided to put back to the Delaware there was not coal enough left to carry her to Bermuda. The sails were not sufficient for her navigation, and had she met tempestuous weather the lives of the crew would have been imperiled, and probably lost.

It is not denied that unseaworthiness releases a crew, and that they become entitled to their full wages for the month or for the voyage; and, if by the month, then for the time they served, with the allowance of a reasonable time for their return to the port of departure.

The objection made by respondent's counsel, that this court cannot entertain jurisdiction of the libels because these libelants have not complied with certain provisions of the acts of congress relating to the discharge of seamen and to the holding of surveys on ships alleged to be unseaworthy, comes too late. The case has been heard on its merits. The discharge and the fact of unseaworthiness can be proved at any stage of the proceedings. Besides, the statutes referred to are not exclusive of other remedies.

It is not necessary to consider the question of abandonment of the voyage.

A decree will also be entered for the payment of the quartermasters.

Authority for the positions taken will be found in 3 Kent, Comm. 187, 204, 205; *Work* v. *Leathers*, 97 U. S. 379; *U. S.* v. *Nye*, 2 Curt. C. C. 225; 1 Abb. Adm. 409; 1 Pars. Adm. Law, 47; *Bray* v. *Atlanta*, Bee, 48; *The Cyrus*, 2 Pet. Adm. 407; *The Frank C. Barker*, 19 Fed. Rep. 332; *The Edward*, Blatchf. & H. 286,