## THE SHAWNEE.

### McKENNA et al. v. THE SHAWNEE.

*(District Court, E. D. Wisconsin. April 13, 1891.)*

SEAMEN—WAGES—MUTINY.

Libelants were seamen on the schooner S., which while at anchor during a heavy head-wind had her windlass carried away. The crew then refused to get the vessel under way, demanding that the vessel be taken to the nearest port for repairs, or, in lieu thereof, that they be paid $50 each additional wages. Her sea-going qualities had not been seriously impaired. But one of her two large anchors was lost, and the windlass, though a convenience, was not essential to her safety. After urging the men to do their duty without success, moved by the lateness of the season, and the difficulty of procuring another crew in that locality, he made the promise, and entered it on the shipping articles. Upon arrival in port, their wages as originally contracted for were offered to them, but were refused, and a libel brought to recover them with the additional compensation. *Held*, that there was no such unseaworthiness as to absolve libelants from the obligation to serve, and their refusal, under the circumstances, amounted to mutiny, for which all wages must be decreed to be forfeited.

In Admiralty. Libel for wages.

*J. W. Wegner* and *M. C. Krause*, for libelants.

*George C. Markham*, for respondent.

JENKINS, J. The libelants at the port of Detroit on the 13th day of November, 1890, shipped as seamen on board the schooner Shawnee on a voyage to Huron, Ohio, for cargo, and thence to the port of Milwaukee, at the stated wages of $2.50 per day and fare home. On receiving cargo the Shawnee proceeded on her voyage in tow of the steamer Spinner, with the Godfrey in tow astern of the Shawnee. The vessels arrived off Mackinac on the 22d of November, and on account of a heavy head-wind came to anchor. The Shawnee cast her large anchor and took in her tow-line from the Spinner, the Godfrey still hanging on to the Shawnee. The windlass of the Shawnee proved insufficient to hold the two vessels against the head-wind, and was carried away, the Godfrey then coming to anchor. In the forenoon of the next day the master of the Shawnee went ashore, wired the owners of the accident, and received instructions to proceed. Returning on board, the master directed the mate to call the men from the forecastle to get the vessel under way. Upon delivery of the order the men stated that they would

not turn to until they had seen the master. Upon going forward, according to the statement of the captain, the men stated that it was worth a little extra to risk their lives at that season of the year. The captain replied that neither he nor the mate was paid anything extra, and that the crew should not ask it, and returned aft. In a short time he again went forward, and asked them if they would turn to. They replied they wished something extra; they wished $50 apiece. The captain refused to pay it, and they said they "would not turn to, but would go ashore first." The captain returned aft, and, finding the Spinner with steam up, again applied to the men to resume their duty, but they refused unless they were granted $50 apiece extra, and they then said "the vessel was not fit to go in." The master then, in consideration of his position, the lateness of the season, his inability there to obtain men, and the consequences of delay, agreed to their demand, and the agreement was entered, at the demand of the men, upon the shipping articles. According to the statement of the libelants, they said to the captain that their lives were in danger, that they could not risk their lives for $2.50 a day, but, if he would agree to pay $50 apiece more, they would go with the vessel, or else they desired the vessel to go to Cheboygan, some 16 miles away, for repairs. The Shawnee having slipped her anchor, the vessels proceeded in tow of the Spinner on the 23d, and arrived at Milwaukee without difficulty on the 25th. The libelants were offered, but refused, their wages under the original contract, and thereupon filed their libel to recover such wages,—$35 each, and $50 each for additional compensation. The respondent pleads duress and compulsion of the captain with respect to the. making of the agreement for extra compensation; concedes that the libelants, provided they had performed their duties, were entitled to the sum of $35 each, and $7.15 each for fare to Detroit; and with the filing of the answer covers the requisite amount into the registry of the court, to be disposed of as the court may direct.

Undoubtedly seamen are absolved from the obligation to serve if the vessel be proved unseaworthy at the commencement of the voyage. But, undertaking service in a seaworthy vessel, they cannot during the voyage impose a new contract upon the master, save in extreme and exceptional cases. The conditions must be such that the crew are not bound to proceed upon the voyage, and are freed from the obligations of the agreement of service. In such case continuance of duty is to be regarded as a new service and a new and voluntary assumption of risks. If, through perils of the sea or otherwise, the vessel becomes so unseaworthy that the voyage cannot be prosecuted except at imminent hazard of life, the crew are not bound to proceed upon the voyage merely because the master in rashness of judgment may choose to proceed. *U. S.* v. *Ashton*, 2 Sum. 13. In such case, if at sea, they may lawfully demand that the vessel be taken to the nearest port; if in harbor, they may lawfully refuse further service. To justify such action, however, the peril of life must be imminent, and the *onus* is upon the seamen to establish the justification.

I am persuaded that here was no condition of affairs justifying refusal to serve. Both the Spinner and the Shawnee, at the commencement of the voyage, were fully equipped, and in all respects seaworthy. The Spinner was supplied with two condensing engines, and was abundantly able to handle her tow. The Shawnee carried a mizzen and mainsail, foresail, and jib and staysail; had two anchors weighing 1,980 and 1,650 pounds, respectively, the latter having 75 fathoms of chain. She was quite able to take care of herself, if through stress of weather the Spinner had been obliged to let go her tow. The changed situation, as the result of the accident, was simply this: That the Shawnee had but one anchor for use instead of two, and was without the service of a windlass, in case of an emergency requiring the use of both anchors, or the speedier action of the windlass in weighing anchor. Here was no imminent or probable danger to life; no rash peril to be assumed; no interposition of the *vis major*, justifying abandonment of the vessel, or refusal to serve. The accident was too trivial; the additional danger which might result therefrom too remote and speculative. I do not believe these men stood in any fear of life from further prosecution of the voyage. I consider the claim in that behalf merely pretentious. No other person anticipated danger from the accident. The female cook, even, was not disquieted. By their own showing, their demand was in the alternative,—either repairs or extra compensation; the former suggested as inducement to the latter, the principal burden of their song. The fact of their willingness to serve for extra compensation, without repairs to the vessel, goes far to discredit their claim that they stood in jeopardy from further prosecution of the voyage in the then condition of the vessel. Men standing in fear of life do not ordinarily so act. I am convinced that the libelants took advantage of the accident to coerce the master to an unjust demand. The attendant circumstances —known to and relied upon by the libelants—compelled acquiescence. The lateness of the season; the inability to obtain seamen at Mackinac; the delay attending the procuring of a crew from below; the improbability that the Spinner would wait upon such detention; the great expense attending delay; the probability that the Shawnee might, through waiting for a crew, be compelled to winter in the straits,—all combined to make effective their demand, so far as the consent of the master could make it effective. It is a grave matter for a court of justice to give effect to an agreement extorted through the necessities of the vessel, and by refusal to serve. To sanction such a demand would be subversive of all discipline on board ship; destructive of the authority of the master; putting at hazard the ship and its cargo, the safety and lives of all on board; disastrous to the interests of commerce. It would be intolerable to allow the crew to sit in judgment upon the command of the master, or to determine the effect of every accident or peril incurred. The primary and paramount duty of the sailor is implicit obedience to every lawful command. He cannot be permitted to debate the propriety of the master's orders, and courts of admiralty will not tolerate any hesitation in prompt and active obedience. *The Elizabeth Frith*, 1 Blatchf. & H. 195. It is only the extremity of danger that will justify resistance to even the rash and improper exer-

cise of the master's authority. Such exceptional cases can be found; but there resistance was for the preservation of life, compelling unseaworthy vessels to return to port. I am referred to no case like the present, where the court is asked to enforce an agreement for exorbitant wages, extorted from the master during the voyage through mutiny of the crew and compulsion of the surrounding circumstances. It is to the honor of the American sailor that no such case can be found. Accustomed to the perils of the sea, fearless in the presence of danger, reckless of his life, prodigal of his means, his conduct is seldom influenced by sordid motive of illegal gain. This, the first, should prove the last and only case of such kind. The extorted agreement was illegal, and will not be enforced.

I cannot rest this decision here. I should, as I conceive, be derelict in the discharge of duty, if the court failed by suitable judgment to properly characterize the conduct of the libelants, and to stamp it with the seal of disapprobation. Here was high and aggravated insubordination to lawful command, challenging the existence of authority; a conspiracy of extortion; gross breach of duty; mutinous conduct. Such acts entail forfeiture of wages of the offending seamen. I have sought to deal with this matter in an indulgent spirit, having regard as well to the condition of the class with whom we have to deal as to the serious mischief flowing from mutinous conduct. I have sought for proper reason to mitigate the forfeiture which the law imposes. I can find none. There was here no provocation to disobedience; no misconduct of the master. The conduct of the crew was without excuse or apology; cowardly and base. There has been manifested no repentance or contrition. Subsequent good behavior may purge the forfeiture, but subsequent service here was in respect of the extorted agreement. They were offered, but refused, their proper wages. They come to this court to seek enforcement of the illegal compact, coerced through their insubordination. They insist here that they shall be rewarded for their disobedience. They ask the court to declare that the servant is greater than the master, and that the virtual command of the ship shall be lodged with the crew. There has been no condonement of their offense by the master or owners. The payment into court of the amount of the wages was not to the use of the libelants, but subject to disposition by the court. The misconduct here was so aggravated, the mischief resulting from disobedience so serious, that the mere refusal to enforce the illegal and extorted agreement would fall short of adequate punishment. The judgment should be such as shall prove effectual to the maintenance of discipline on shipboard, the upholding of the authority of the master, and the discouragement of mutinous and extortionate conduct. It is within the province of the court to impose forfeiture of wages. That is the extent of the authority here. Such forfeiture, however inadequate as punishment for one of the highest offenses known to the maritime law, will be declared here as fitting warning to others who may be disposed to like insubordination and dereliction of duty. The libel will be dismissed, with costs, and the amount deposited by the claimants in the registry of the court will be returned to them.