## THE CONDOR.

### (District Court, S. D. New York. April 22, 1912.)

1. SEAMEN (§ 9*)—PERFORMANCE OF SERVICE—DUTY TO STAY WITH SHIP.

   A crew is obliged by its articles to stand by the ship and obey the master until the voyage is done, unless she come to such a pass as to be dangerous to human life, or they have reasonable ground for so believing; but, in case of a difference between them and the master as to seaworthiness, it is the better practice at least to demand a survey when in port.

   [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 31–33; Dec. Dig. § 9.*]

2. SEAMEN (§ 21*)—RIGHT TO WAGES—DESERTION.

   Seamen *held* not justified in deserting their ship, and to have forfeited their right to extra wages exacted as a condition of serving out the voyage, on the ground of her unseaworthiness, where they were not required to be more than 15 hours from a port, and two surveys at different ports had resulted in findings that she was fit to proceed.

   [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 92–110; Dec. Dig. § 21.*]

3. SEAMEN (§ 9*)—SEAWORTHINESS OF VESSEL—DECISION OF MASTER.

   So long as a master does what he can to obtain an impartial opinion as to the seaworthiness of his vessel, acts in accordance with it and within reasonable bounds of a fair judgment, and trusts his life upon the venture equally with his men's, his decision must control as to whether the voyage shall break up, and the whole ship's company is bound by it.

   [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 31–33; Dec. Dig. § 9.*]

In Admiralty. In the matter of the Condor. Suit for wages. Libel dismissed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

B. B. Coyne, for libelants.
John M. Woolsey, for claimant.

HAND, District Judge. [1] The law of this case is plain enough, and it is this: A crew is obliged by its articles to stand by the ship and obey the master until the voyage be done, unless she come to such a pass as to be dangerous to human life. Hartley v. Ponsonby, 7 El. & B. 872; The Shawnee (D. C.) 45 Fed. 769; U. S. v. Ashton, 2 Sumn. 13, Fed. Cas. No. 14,470; The Heroe (D. C.) 21 Fed. 525; U. S. v. Nye, 2 Curt. 225, Fed. Cas. No. 15,906; The Hibernia, 1 Spr. 78, Fed. Cas. No. 6,455; U. S. v. Givings, 1 Spr. 75, Fed. Cas. No. 15,212; The C. F. Sargent (D. C.) 95 Fed. 179. It is the seamen's reasonable belief, rather than the fact which controls. U. S. v. Ashton, supra; U. S. v. Nye, supra; The Hibernia, supra; U. S. v. Givings, supra. The better practice at least is to demand a survey when in port. The Hibernia, supra; U. S. v. Givings, supra. Indeed, in The C. F. Sargent, supra, this is required of the seamen in the case of a difference between them and the master as to seaworthiness.

[2] The question, therefore, is whether the seamen thought her unseaworthy, and whether they had reasonable ground to think so. If the proposal had been that they should sail around the Horn with the boat in that condition, I should have had less doubts as to the propriety of their refusal. The ship's bottom was strained, and many of the rivets were actually out. Some of the plates were sprung. While I think that there was very little leaking after she was repaired in Port Montt, it would have been a question whether she was in any condition to stand heavy weather for a long time. That was not what was expected of her, but only that she should coast along from port to port up to Callao. No single stretch was longer than 260 miles, so that she would never be more than 15 hours from a harbor. Nor does it appear that she could not have been beached in extremis at different places along the coast.

The question of whether she was fit or unfit for such service is, therefore, the real question. I cannot say that under all conditions she would inevitably have been able to make a harbor as she was; but that she should have foundered in so short a distance, with her own time to choose when she should leave each port, seems to me to have been extremely unlikely, and no increase of the risk which every man incurs who embarks upon the sea. This is corroborated by several facts, and, first, that all the officers had no hesitation in taking her on her course and remaining with her. Indeed, they thought it unnecessary to refit her at the first dry dock, but waited until their return from Ecuador. They may have been reckless; but they were in part men with families, and not presumably indifferent to their own safety. Nothing of the sort is suggested, and I must assume that they honestly thought that they were incurring no serious risk.

Moreover, both at Ancud and at Port Montt surveys were held and the ship was given leave to sail. There is nothing to impeach these surveys. It is true that at Ancud the diver was the sole source of information, and he was one of the surveyors; but his information

of what he found and what he had done proved true, and there is no reason to question the independence of judgment of the other two. The libelants seem to suppose that, because the diver did the work, he must have had a bias to release the ship; but there is no ground to suppose so. He was employed presumably to do what he could to repair her, not to contract to make her seaworthy. At most it can be supposed only that, having been employed by her master, he would have some bias to take the master's view of the staunchness of the vessel when he was through. That may be; but it ought not to destroy the validity of the survey, when none of the surveyors were responsible for that staunchness. It is quite unfair to say that their survey amounted to no more than the diver's certificate as to his own work.

However it may be of the Ancud survey, none of these considerations apply to that made at Port Montt. It is true that of these surveyors one only was a mariner; but they were as well fitted as it was possible to get under the circumstances. They made an examination, and agreed that she might proceed as the other surveyors had said. Now, although the crew talked with two of the second surveyors, and presumably learned what they had found, they did not ask for another survey. They might have thought the survey unfair, or unsatisfactory, or they might not; but it would have been the more natural course, had they supposed that the surveyors had been prejudiced or incorrect, for them in some way to challenge their result. Prima facie, the survey was the honest judgment of impartial men. In addition, there was a German consul, to whom, being Germans, they could have asked leave to apply; but they did nothing of the sort.

Finally, however, I do not believe that they ever thought their lives in any danger. The master says that they were afraid that they would lose their clothes, and put the value at £10. Both Frederick and Schrader said on the stand that they were concerned about the loss of their clothes. Indeed, Schrader, one of the two spokesmen of the crew, at first told me that they wanted the contract as security for their clothes, but when I pressed him till he saw that this would not answer, said that they were an incidental consideration. I must say that the incident did not impress me favorably then, and, when I came to read the depositions, it rather confirmed my impression that they felt conscious that their position was untenable as to the safety of their lives, and were trying to have it appear that they only wanted to have some security against loss of property. On the whole case they have not satisfied me, either that they honestly feared for the ship's safety, or that they had any reasonable ground to fear.

A judge should, of course, be careful not so to construe the law as to force the crew to risk their lives on any unseaworthy ship; but, on the other hand, if they may finally choose, without subsequent question, to regard any injury to the ship as absolving them from further service, the condition of their master will be quite helpless. Here they probably knew the actual fact that no crew could be got nearer than Valparaiso. The situation was not, so far as I can see, that of a crew harshly held to a bargain now become dangerous, but of one, not sincerely afraid, but attempting to exploit the necessities of their master. If so, it is surely a very dangerous practice to encourage,

and one which directly promotes insubordination and mutiny. Discipline on the sea is not like that on the land in ordinary industrial employments. The relations between master and man require an authority which is not necessary when both parties have immediate recourse to constituted authority. No doubt countless misery and brutality has arisen from the exercise of master's authority; but the substance of that authority still remains in civilized countries, and must remain, if men are to put to sea for weeks, out of reach of the usual methods of keeping order.

[3] So long as a master does what he can to obtain impartial outside opinion, acts within reasonable bounds of a fair judgment, and trusts his life upon the venture equally with his men's, his decision must control as to whether the voyage shall break up, and the whole ship's company is bound by it. To hold otherwise is to imperil his authority and the whole safety of ships and those upon them.

Libel dismissed.