## HAMILTON et al. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. July 6, 1920.)

No. 1816.

1. **Seamen ⬅12—Not entitled to discharge in port of distress.**

Under Rev. St. §§ 4511, 4530, and amendments (Comp. St. §§ 8300, 8322), neither master nor crew can renounce their duties under the contract until the end of the voyage, which means the port of destination, not a port of distress; so that the seamen are bound to serve until the voyage ends in the port of destination, if it is extended beyond the time mentioned in the contract, not by the intention or negligence of the master, which would be a breach of the contract releasing the seamen, but by perils of the sea.

2. **Seamen ⬅34—Agreement of crew to refuse to work is "revolt."**

The agreement of the entire crew of a ship anchored in a port of refuge before the end of the voyage to refuse to obey the orders of the master, because the time mentioned in the contract had expired, is endeavoring to make a "revolt," and conspiring to revolt, under Criminal Code, § 292 (Comp. St. § 10465), though there was no effort to usurp the command of the master, or to take charge of the ship, since the master cannot be in command of the ship unless the crew is obedient to his orders.

[Ed. Note.—For other definitions, see Words and Phrases, Revolt.]

3. **Seamen ⬅34—Statute punishing "willful disobedience" applies to individual acts, while "revolt" implies combination.**

Rev. St. § 4596, subds. 4 and 5, as amended by Act March 4, 1915 (Comp. St. § 8380), making a misdemeanor the "willful disobedience" of seamen, relates to mere ordinary disobedience or neglect of duty by one or several seamen, while Criminal Code, § 293 (Comp. St. § 10466), covers the more serious offense of "revolt," by such combination and co-operation of refusal to obey as deprives the master of his authority and command.

4. **Seamen ⬅34—Erroneous construction of statute by seamen does not disprove guilt of revolt.**

The fact that seamen erroneously construed the statute as giving them the right to quit service in a port of refuge at the termination of the contract term, though such construction was contrary to the terms of the statute and its construction by the courts, and the American consul advised them they were still bound to serve, is no defense in a prosecution for revolt, though an honest mistake by them as to a fact on which their liability for further service depended would be a defense.

5. **Seamen ⬅9—Need serve to end of voyage only if vessel is "seaworthy."**

Inherent in the shipping articles of seamen is the absolute obligation of the owners and operator to see that the vessel was seaworthy; that is, she must be tight, staunch, and strong, and so equipped and the cargo so stored as to resist all ordinary action of the sea. But it is not neces-

sary that she be in perfect condition or equipped with the most improved appliances.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Seaworthy.]

**6. Seamen ⊕⇒9—Presumption is that vessel is seaworthy.**

While seamen are not bound to serve on a vessel which is unseaworthy, or which they believe on reasonable grounds is unseaworthy, though it may turn out on further investigation that it was in fact seaworthy, the presumption is in favor of seaworthiness, and the crew should not refuse further service because of unseaworthiness, until after they had used reasonable means to ascertain the actual condition of the vessel, including a resurvey, if that be practical.

**7. Seamen ⊕⇒34—Evidence held not to show vessel was unseaworthy.**

Evidence which showed that the vessel's failure to reach port of destination before the time stated in the contract was. due to engine trouble and to the loss of three propeller blades *held* not to establish unseaworthiness, which would justify refusal of the crew to serve further, where there was no evidence that they complained of any defect in the vessel or its machinery, and they made no demand for a survey, and the testimony of the master was undisputed that he had a Lloyd certificate of seaworthiness.

**8. Criminal law ⊕⇒1172(1)—Erroneous charge immaterial, where guilt undisputed.**

Where the sole ground for the joint refusal of the crew to serve to the end of the voyage was an erroneous construction of the statute, so that their guilt was indisputable, any erroneous statement of law in the charge was immaterial.

In Error to the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Judge.

E. Hamilton and others were convicted of endeavoring and conspiring to make a revolt as merchant seamen, and they bring error. Affirmed.

Certiorari denied 254 U. S. ——, 41 Sup. Ct. 15, 65 L. Ed. ——.

Henry Bowden, of Norfolk, Va., and George Sutherland, of Washington, D. C., for plaintiffs in error.

Hiram M. Smith, U. S. Atty., of Richmond, Va.

Before KNAPP and WOODS, Circuit Judges, and ROSE, District Judge.

WOODS, Circuit Judge. A general verdict of guilty was found against the appellants, seamen of the United States merchant ship Poughkeepsie, on an indictment framed under section 292 of Penal Code (Comp. St. § 10465). The first count charged an endeavor to make a revolt; the second, conspiracy to make a revolt; the third, a combination and conspiracy "to refuse and neglect to perform their proper duty on board of the said vessel."

The pivotal question is whether the evidence required the direction of a verdict of acquittal. The shipping articles, dated August 5, 1919, stipulated for the voyage as follows:

"From the port of New York to one or more ports in France, and such other ports and places in any part of the world as the master may direct, and back to a final port of discharge in the United States (north of Cape Hatteras), for a term of time not exceeding six calendar months."

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Leaving New York on August 29, 1919, the vessel arrived in Havre in about 13½ days. She left Havre November 12th for Southampton, and left Southampton November 14th for New York. On November 22d, on account of boiler trouble, she went to Fayal, Azores, as nearest point for repairs. Having remained there until December 30th, she again sailed for New York in abundant time to reach that port and complete her voyage before the end of the 6-months period. On January 2d, 5th, and 6th the ship lost three propeller blades in succession and became helpless. In response to a wireless call for assistance, another vessel towed her to Granaway's Deep, about three miles from Hamilton, Bermuda, considered a part of its harbor, though not closely landlocked. Here she anchored on January 22d, for repairs. On February 4th, before the repairs had been completed, the defendants stopped work and served on the master a written ultimatum, claiming the remainder of wages due them and free transportation to New York, on the ground that their term of service had expired. The master refused to accede to the demand and reported the matter to the American consul. The consul in person and by written communication warned the seamen that they were violating their shipping articles and should return at once to work. They persisted in their refusal to work, but remained on the vessel, having no money, and received from the vessel food and shelter. The defendants were guilty of no violence, and made no effort to interfere with the control of the ship, unless refusal to perform the duties of a crew can be so regarded. Another crew was employed, and the defendants were arrested and brought in the ship to the port of Newport News.

Counsel contend that a verdict of acquittal should have been directed for three reasons: First, the term of service of the seamen was at an end when the ship reached a port of safety after the expiration of the period of 6 months from the date of the contract; second, the action of the defendants did not constitute an endeavor or a conspiracy to commit a revolt, within the meaning of the statute, and therefore the evidence did not sustain the charge of the first and second counts; third, the statute does not make a combination or conspiracy to neglect and refusal to perform proper duty on board the vessel a criminal offense.

[1] The first position is clearly untenable. Section 4511, Revised Statutes, and amendments (section 8300, Compiled Statutes), and the form provided in the schedule annexed, and section 4530, Revised Statutes, and its amendments (section 8322, Compiled Statutes), for the protection of seamen, relate to the voyage, and impose duties on the ship and seamen for the voyage. Neither can renounce those duties during the voyage. These statutes on their face, and the judicial construction given them, leave no doubt of these conclusions: (1) The master cannot discharge the crew, and the crew cannot demand wages in full, until the end of the voyage; (2) the end of the voyage is not a port of distress, but the port of destination; (3) seamen are bound to serve until the voyage ends in the port of destination, unless there has been a breach of the contract by the master as to the time of the voyage or in some other material particular; (4) extension of the time of the

268 F.—2

voyage by intention or neglect of the master is such breach of the contract as entitles the seamen to demand their release on that ground in any safe port; (5) but extension of the voyage beyond the time mentioned in the contract, due to perils of the sea which the master or owner could not be reasonably expected to guard against, is not a breach of the contract as to time, and does not warrant seamen in leaving the vessel or demanding wages in full before reaching the port of destination; (6) on the other hand, seamen are entitled to their wages and discharge when the ship reaches the port of destination before the expiration of the stipulated time of the voyage. Fairchild v. The Aurelius, 8 Fed. Cas. 953; The Hotspur, 12 Fed. Cas. 562; Schermacher v. Yates (D. C.) 57 Fed. 668; The Falls of Keltie (D. C.) 114 Fed. 357; The Belvedere (D. C.) 100 Fed. 498; Belyea v. Cook (D. C). 162 Fed. 180; The Catalonia (D. C.) 236 Fed. 554; Board of Trade v. Baxter (1907) A. C. 373, 9 Ann. Cas. 501, 505. There was no demand for release and payment of wages on the ground that the voyage had been extended by the willful or negligent action of the owner or master, and the proof did not require the conclusion that the extension of the voyage was due to that cause.

Was there a failure of evidence from which a reasonable inference of endeavor to make a revolt or conspiracy to revolt could be drawn? Section 293 of Penal Code (Compiled Statutes, § 10466) defines revolt:

"Whoever, being of the crew of a vessel of the United States, on the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States, unlawfully and with force, or by fraud, or intimidation, usurps the command of such vessel from the master or other lawful officer in command thereof, or deprives him of authority and command on board, or resists or prevents him in the free and lawful exercise thereof, or transfers such authority and command to another not lawfully entitled thereto, is guilty of a revolt and mutiny, and shall be fined not more than two thousand dollars and imprisoned not more than ten years."

Section 292 of Criminal Code (Act of 1835, Compiled Statutes, § 10465), under which defendants were indicted, provides:

"Whoever, being of the crew of a vessel of the United States, on the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States, endeavors to make a revolt or mutiny on board such vessel, or combines, conspires, or confederates with any other person on board to make such revolt or mutiny, or solicits, incites, or stirs up any other of the crew to disobey or resist the lawful orders of the master or other officer of such vessel, or to refuse or neglect their proper duty on board thereof, or to betray their proper trust, or assembles with others in a tumultuous and mutinous manner, or makes a riot on board thereof, or unlawfully confines the master or other commanding officer thereof, shall be fined not more than one thousand dollars, or imprisoned not more than five years, or both."

[2] The specific question is whether the agreement of the entire crew of the ship, anchored in a port of refuge before the end of the voyage, to refuse to obey the orders of the master, and their united action in carrying out the agreement, while remaining on board, is endeavoring to make a revolt. This was not usurpation of the command from the master, for there was no effort to take charge of the ship. But evidently it was a successful endeavor to deprive him of authority and command on board, and to resist and prevent him in the free and lawful exer-

cise of his command. The united action of a crew in refusing to yield obedience to the lawful command of the master deprives him of the authority and command he was in duty bound to exercise. This is as much resistance and prevention of the free and lawful exercise of his authority and command as an undertaking by a crew to deprive him of any inanimate instrumentality necessary to the command and management of the ship. A master may have possession of the ship alone, but he cannot be in command of it, if the crew unite in refusing to carry out his orders. Command of a fortress means actual control of the garrison for military purposes. Command of a ship means actual control of the crew for nautical purposes. If all the garrison of a fortress, or all the crew of a ship, refuse obedience to the commander, they deprive him of authority and command; they resist and prevent the exercise of his authority and command.

"An endeavor to commit a revolt may be complete, not merely by stirring up, encouraging, or combining with others of the ship's crew to produce a general disobedience of all orders, but also by stirring up, encouraging, or combining with any one or more of the crew to produce a deliberate disobedience to any one lawful order of the master or other officers." United States v. Thompson, 28 Fed. Cas. 102; United States v. Cassedy, 25 Fed. Cas. 321; In re Simpson (D. C.) 119 Fed. 620; United States v. Lynch, 26 Fed. Cas. 1033; United States v. Forbes, 25 Fed. Cas. 1141; United States v. Nye, 27 Fed. Cas. 210.

It is true the Supreme Court in United States v. Kelley, 11 Wheat. 417, 6 L. Ed. 508 (1826), said the offense of endeavoring to commit a revolt—

"consists in the endeavor of the crew of a vessel, or any one or more of them, to overthrow the legitimate authority of her commander, with intent to remove him from his command, or against his will to take possession of the vessel by assuming the government and navigation of her, or by transferring their obedience from the lawful commander to some other person."

This definition does not include a combination of the entire crew to refuse obedience and the actual refusal of obedience to the master. But Justice Story, in United States v. Haines, 26 Fed. Cas. 62 (1829), held that such combination and co-operation did constitute an endeavor to commit a revolt, saying as to the language of the court in United States v. Kelley:

"In truth, I consider the definition given by the Supreme Court not to have been designed to have more than an affirmative operation; that is, to declare that such acts would amount to the offense, and not negatively, that none others would. I was one of the judges who concurred in the opinion given in the Supreme Court; and it was matter of utter surprise to me when I first learned that such a narrow interpretation of it as is now contended for had been contended for at the bar. I have reason to know that it was equally a surprise upon others of my brethren who concurred in that opinion."

In United States v. Gardner, 25 Fed. Cas. 1258, decided later in the same year Judge Story again holds that proof of such combination and co-operation is sufficient. So it seems clear that the action of the defendants would have been an endeavor to commit a revolt, even before it was made clearly so by the act of 1835. Other cases touching the point, but not deciding it, need not be reviewed.

[3] The argument was earnestly pressed that if the defendants violated any penal statute it was subdivision 4 and 5 of section 4596 of Revised Statutes (Compiled Statutes, § 8380), as amended by the act of, 1915, which provides for the punishment of the misdemeanor of willful disobedience of seamen by imprisonment for not more than one month, and continued willful disobedience or continued neglect of duty by imprisonment not more than three months. It is evident that this section relates to mere ordinary disobedience or neglect of duty by one or several seamen, while section 293 of the Criminal Code covers the more serious offense of revolt by such combination and co-operation in refusal to obey as deprives the master of his authority and command, or amounts to resistance or prevention of his free and lawful exercise of his authority and command, and section 292 covers an endeavor or conspiracy to make such revolt. United States v. Forbes, 25 Fed. Cas. 1141.

[4] There is authority for the position that seamen's refusal to obey the master under mistaken belief, having reasonable foundation, in the existence of a fact which, if it existed, would justify their refusal, is not criminal. United States v. Givings, 25 Fed. Cas. 1331. But the defendants were ignorant of no fact necessary to constitute the crime. The most that can be said for them is that, in doing the acts which constituted crime, they deliberately took the risk of their own opinion of the law, in the face of the warning of the master and the American consul. It is not even claimed that they were ignorant of the existence of the statute, but only that they relied on their own construction of it, that they were entitled to discharge before they had reached the port of destination merely because the term of 6 months had expired, which we have seen was without reasonable foundation in the language of the statute or in the decisions of the courts. Confidence in their construction of the statutes may be a ground for such judicial clemency as was actually exercised in this case—the sentence being two days' imprisonment and a fine of $50, without costs—or for executive clemency. It is not a ground of acquittal. Reynolds v. United States, 98 U. S. 145, 167, 25 L. Ed. 244; State v. Simmons, 143 N. C. 613, 56 S. E. 701; Commonwealth v. Middleby, 187 Mass. 342, 73 N. E. 208.

The trial judge charged the jury in effect that they must find as a condition of conviction that—

"Reasonable care had been exercised by the master of the Poughkeepsie to determine whether she was in seaworthy condition."

The defendants insist that the District Judge should have charged as requested by them:

"If the jury believe from the evidence that the voyage as described in the shipping articles was prolonged beyond the period of 6 months without fault on the part of the crew because of unseaworthy or defective condition of the ship with reference to her boilers, engine, propeller and other equipment and not because of unusually violent weather, then if the jury also believe from the evidence that at the expiration of the period of 6 months the said vessel was safely in port at Hamilton, Bermuda, then the accused were legally entitled to their discharge and were not legally compelled to obey any commands of the master or other officers of the ship after that time, unless the ship was in danger."

[5] Inherent in the shipping articles was the absolute obligation of the owners and operators to see that the vessel was seaworthy. To be seaworthy the vessel must be tight, staunch, and strong, and so equipped and the cargo so stored as to resist all ordinary action of the sea. Du Pont v. Vance, 19 How. 162, 167, 15 L. Ed. 584; Corsar v. Spreckels & Bros. Co., 141 Fed. 260, 264, 72 C. C. A. 378; The Osceola, 189 U. S. 158, 175, 23 Sup. Ct. 483, 47 L. Ed. 760; Thompson Towing & Wrecking Ass'n v. McGregor, 207 Fed. 209, 211, 124 C. C. A. 479; The Caledonia, 157 U. S. 124, 133, 15 Sup. Ct. 537, 39 L. Ed. 644; Rainey v. New York & P. S. S. Co., 216 Fed. 449, 453, 132 C. C. A. 509, L. R. A. 1916A, 1149. But the requirement does not extend to perfect condition of the vessel or the most improved appliances. In re Tonawanda I. & S. Co. (D. C.) 234 Fed. 198; The Santa Clara (D. C.) 206 Fed. 179. The correlative duty on the part of seamen is to serve until the end of the voyage. But they are not bound to serve on a vessel which is unseaworthy, and they should be acquitted of the charge of desertion or revolt, or endeavor to revolt, if in apprehension of danger they leave the ship or refuse to serve, asserting and believing on reasonable grounds that the ship is unseaworthy, although it may turn out on further close investigation that it was in fact seaworthy, for reasonable apprehension of loss of life or limb is set above delay of the vessel. United States v. Givings, 25 Fed. Cas. 1331; United States v. Ashton, 24 Fed. Cas. 873.

[6] But the presumption is in favor of seaworthiness, since the owners and officers ordinarily would not venture the risk of property or life in an unseaworthy ship, and from their superior ability and skill their judgment is entitled to much greater weight than that of the crew. United States v. Ashton, supra; United States v. Nye, 27 Fed. Cas. 210; United States v. Staly, 27 Fed. Cas. 1290. The importance of obedience and discipline on a ship, to the end that it may proceed on its voyage, imposes on the crew, after they have commenced the voyage, the duty to use reasonable means to ascertain the actual condition of the vessel, including a resurvey, if that be practicable, before refusal to serve for unseaworthiness. United States v. Staly, supra; The C. F. Sargent (D. C.) 95 Fed. 179; The Shawnee (D. C.), 45 Fed. 769; The Condor (D. C.) 196 Fed. 71.

We are not called on to determine the right of seamen, when the voyage is extended from any cause so much beyond the stipulated time as that service to the port of destination would be oppressive; for the end of the voyage would have been only a few days beyond the 6 months mentioned in the articles.

[7] Applying the rules stated, we think the evidence leaves the defense of unseaworthiness of the vessel without support. It is true that the failure to reach the port of destination was due to the fact that the engine had to be repaired at Fayal and that the ship lost three propeller blades. There was some vague testimony also from the crew that on the voyage the master had expressed dissatisfaction with the propeller blades. But mere failure of machinery, or failure to provide the best machinery, does not prove unseaworthiness, nor even negligence. There is not a particle of evidence that the crew ever complained

of any defect in the vessel or its machinery, or that they ever had apprehension for their safety. They made no demand for a survey at Havre, Southampton, Fayal, or Hamilton. The testimony of the master was undisputed that he had a certificate from Lloyd's of seaworthiness after examination in England and the Azores.

[8] In short, the reason for allowing seamen to refuse to serve to the port of destination is reasonable apprehension of danger to themselves from unseaworthiness of the ship at the time. There was never any claim of apprehension of danger or charge that the vessel was unseaworthy, and it was in course of having the propeller blades replaced. The sole averred ground in the communication to the master, and in the evidence of the defendants for the combination to refuse to serve when within a few days of the port of destination was that the period of 6 months mentioned in the contract had expired. This position being untenable, the testimony on both sides makes out an indisputable case of guilt under the first and second counts of the indictment. The request to charge was therefore inapplicable, and any erroneous statement of law in the charge was immaterial. This conclusion makes discussion of the third count unnecessary.

Affirmed.